Justin Augustine (CA Bar No. 235561)
Center for Biological Diversity
351 California St., Suite 600
San Francisco, CA 94104
(415) 436-9682
Fax: (415) 436-9683
jaugustine@biologicaldiversity.org

Rachel M. Fazio (CA Bar No. 187580)
John Muir Project of Earth Island Institute
P.O. Box 897
Big Bear City, CA 92314
(530) 273-9290
rachelmfazio@gmail.com

Sean Malone (OR Bar No. 084060) *pro hac vice to be requested*
Attorney at Law
259 E. Fifth Ave.
Suite 200-G
Eugene, OR 97401
(303) 859-0403
seanmalone8@hotmail.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**
**FRESNO DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, EARTH ISLAND INSTITUTE, and CALIFORNIA CHAPPARAL INSTITUTE<br><br>      Plaintiffs,<br><br>   v.<br><br>SUSAN SKALSKI, in her official capacity as Forest Supervisor for the Stanislaus National Forest, and UNITED STATES FOREST SERVICE, an agency of the Department of Agriculture,<br><br>       Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

COMPLAINT                                             1

# INTRODUCTION

1. High-intensity fire, wherein most or all trees are killed in a given area, is now understood to be one of the most ecologically important occurrences on the landscape. When such fire occurs in mature, conifer forest, for example, – as it did in the Rim fire of 2013, the subject of this complaint – it creates outstanding wildlife habitat for numerous species, if left unlogged.

2. The Rim fire occurred in the summer of 2013, covering just over 257,000 acres, about 60% of which was within conifer forest (the remainder being mainly grassland, shrubland, and oak woodland types). Within conifer forest, the Rim fire was a mixed-intensity fire, with approximately one-third of the conifer forest experiencing high-intensity fire effects (wherein most or all trees were killed).

3. Snag forest habitat, also known as "complex early seral forest", is one of the rarest and least protected of all forest habitat types in the Sierra Nevada. Due to fire suppression policies, there is now about one-fourth as much high-intensity fire—the type of fire that creates complex early seral forest—as there was prior to the early 20th century (Hanson and Odion 2014, Odion et al. 2014). This deficit is further exacerbated by losses due to post-fire logging of snags (standing fire killed trees) and eradication of native fire-following shrubs. This habitat—if not subjected to post-fire logging— supports levels of native biodiversity and wildlife abundance comparable to, and sometimes higher than, that of unburned mature/old forest (Raphael et al. 1987, Burnett et al. 2010, Swanson et al. 2011). In complex early seral forest, native wood-boring beetles lay their eggs on snags, and their larvae, after boring into the snag, become the primary food source for black-backed woodpeckers and other woodpecker species (Hanson and North 2008, Siegel et al. 2013) which create new nest cavities every year (even when they stay in the same territory), allowing the cavity from the previous year to be used by many cavity-nesting species that cannot create their own nest holes, like bluebirds, nuthatches, chickadees, and even flying squirrels (Tarbill 2010). Native, flowering, shrub patches in complex early seral forest attract native, flying insects, which provide food for fly-catching birds and rare and sensitive bat species (Swanson et al. 2011, Buchalski et al. 2013), and these shrub patches are excellent habitat for small mammals which, in turn, provides food for raptors like the California spotted owl,

which preferentially selects such areas to find its prey (Bond et al. 2009, Bond et al. 2013). This is a rich and vibrant ecosystem, if left unlogged. The Rim fire logging project would log most of the snag forest habitat within the Rim fire on the Stanislaus National Forest.

4.	This case seeks to protect essential burned forest habitat for the California spotted owl, a "sensitive species" that is currently in decline on Forest Service lands in the Sierra Nevada mountain range of California where logging is allowed, but is not declining in the small proportion of forests protected from logging (Conner et al. 2013, Tempel and Gutiérrez 2013, Tempel 2014). Specifically, because the science regarding spotted owl's relationship with burned forest (Bond et al. 2009) shows that California spotted owls preferentially select intensely burned forest when searching for food within 1.5 km of their nests and roosts (see also Clark 2007), this case seeks to protect burned forest owl habitat within 1.5 km of occupied owl sites in the Rim fire area.

5.	During the spring and summer of 2014 (April-August), California spotted owl surveys were conducted in the Rim fire area, and it is now known that at least 37 occupied owl sites exist within the Rim fire area – 32 pairs and 5 singles, based on the Forest Service's summary account of its 2014 surveys in each of the territories. These post-fire spotted owl occupancy levels in the Rim fire are considerably *higher* than average annual occupancy levels in unburned old forest. Even in the spotted owl territories that experienced mostly high-intensity fire effects (patches of forest wherein most or all trees were killed) in the Rim fire, pair occupancy was essentially the same as it was in territories with mostly low/moderate-intensity fire effects. These owls need food to survive and therefore it is essential that the places within which they find their food in a post-fire landscape – including intensely burned forest within 1.5 km of their nests and roosts (or the best available known owl location) – are protected.

6.	The Rim fire Record of Decision (ROD) and Final Environmental Impact Statement (FEIS), however, do not protect owl habitat within 1.5 km of occupied owl sites, as recommended by the best available science (Bond et al. 2009). Instead, the ROD and FEIS authorize logging within <u>all</u> 37 occupied owl territories and do so without (a) conducting a proper analysis of the impacts of this logging on the ability of these resident owls to survive in their territories, and (b) despite the fact that current science shows that post-fire logging of intensely burned forest causes the owls to avoid post-

COMPLAINT        3

fire logged areas (Clark 2007) and results in the owls abandoning their territories (DellaSala et al. 2010, Lee et al. 2012, Clark et al. 2013), making the owls vulnerable to starvation and predation from larger and more aggressive raptors as they search for new territories in a landscape wherein habitat is already limited.  This exacerbates the population decline already occurring.

7. The Forest Service failed to conduct a meaningful analysis that candidly discloses adverse impacts to spotted owls from post-fire logging despite a letter from spotted owl expert Monica Bond detailing the remarkably high owl occupancy in the Rim fire (sent to the Forest Service just days after the final Rim fire spotted owl occupancy results were finalized), as well as numerous earlier comment letters that emphasized the importance of protecting post-fire owl habitat from logging. Nowhere in the Rim fire Final EIS is this information regarding the extraordinarily high post-fire occupancy levels found.

8. Moreover, in direct defiance of the only science which has evaluated how California spotted owls use burned forest, and the effects of post-fire logging in occupied owl territories on owl occupancy, the ROD/FEIS *target* for logging the places that owls preferentially select for finding their food in a post-fire environment.  In fact, the FEIS explicitly states that it targeted severely burned forests for logging:  "The only areas proposed for salvage treatments, other than hazard removal, are those that burned at high severity."  The ROD/FEIS did so despite acknowledging that "the Rim Fire area may be considered particularly important to the distribution of California spotted owl." (FEIS at 338.)

8. The ROD/FEIS also fail to provide a meaningful basis for the conclusion that the Rim fire logging project may affect individual California spotted owls but is not likely to result in a trend toward listing under the federal Endangered Species Act (ESA) or threaten population viability. Nowhere does the ROD/FEIS assess the extent of the potential loss of occupancy from the proposed logging, and the effect that this would have on the already declining population, especially in an Area of Concern – an area wherein adverse impacts are disproportionately high and risk severing connections between spotted owls north and south of the project area, thus fragmenting the population further.  The entire Rim fire project area is within an Area of Concern (Rim fire FEIS, p. 338).

COMPLAINT 4

Moreover, nowhere does the ROD/FEIS determine the critical threshold of California spotted owl population needed to ensure that a threat to population viability is avoided, and fail to determine whether the planned logging would push the species below this threshold.  The ROD/FEIS also fail to analyze reasonably foreseeable cumulative effects and connected actions in the form of already-announced plans to implement another project in the Rim fire area—one that would remove/reduce shrubs and artificially plant conifers, thus further degrading and eliminating the habitat used by the small mammals that spotted owls depend upon for their food in high-intensity fire patches.  The FEIS claims that this cumulative/connected project is not reasonably foreseeable, but repeatedly makes references to plans to reforest the fire area (*e.g.*, FEIS, p. 226, first paragraph), and the Forest Service has now held two public meetings promoting this cumulative/connected project.

9. Through this action, Plaintiffs Earth Island Institute, the Center for Biological Diversity, and the California Chaparral Institute challenge the "Rim Fire Recovery Project" and seek injunctive relief to protect occupied spotted owl habitat.  This action arises under, and alleges violations of, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*; the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*; and the statutes' implementing regulations.

**JURISDICTION**

10. Jurisdiction over this action is conferred by 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), and 2202 (injunctive relief).  This cause of action arises under the laws of the United States, including NEPA and the APA, and implementing regulations established pursuant to these federal statutes. An actual, justiciable controversy exists between Plaintiffs and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 705 and 706.

**VENUE**

11. Venue in this Court is proper under 28 U.S.C §§ 1391 and 1392.

**PARTIES**

12. Plaintiff Earth Island Institute ("EII") is a nonprofit corporation organized under the laws of the state of California. EII is headquartered in Berkeley, California. EII's mission is to develop

1 and support projects that counteract threats to the biological and cultural diversity that sustains the
2 environment.  Through education and activism, these projects promote the conservation, preservation
3 and restoration of the Earth.  One of these projects is the John Muir Project—whose mission is to
4 protect all federal public forestlands from commercial exploitation that undermines and compromises
5 science-based ecological management. John Muir Project offices are in San Bernardino County,
6 California.  EII is a membership organization with over 15,000 members in the U.S., over 3,000 of
7 whom use and enjoy the National Forests of California for recreational, educational, aesthetic, spiritual,
8 and other purposes.  EII, through its John Muir Project, has recently appealed numerous timber sales on
9 National forests in the Sierra Nevada, including the Project at issue in this case which, if implemented,
10 would adversely affect the interests of their members.  EII through its John Muir Project has a
11 longstanding interest in protection of national forests.  EII's John Muir Project and EII members
12 actively participate in governmental decision-making processes with respect to national forest lands in
13 California and rely on information provided through the NEPA processes to increase the effectiveness
14 of their participation.

15         13.     Earth Island Institute's members include individuals who regularly use public lands
16 within the Stanislaus National Forest, and Rim fire area in particular, for scientific study, recreational
17 enjoyment, aesthetic beauty, and nature photography.  These members' interests will be irreparably
18 harmed by the planned logging in the Rim fire area, as they will no longer be able to scientifically
19 study these areas in their natural (pre-logging) state, take nature photographs of the area in its natural
20 (pre-logging) state, or enjoy the aesthetic beauty of the unlogged snag forest habitat and its inhabitants
21 in their natural state.

22         14.     Plaintiff Center for Biological Diversity ("the Center") is a non-profit corporation with
23 offices in San Francisco, Los Angeles, and Joshua Tree, California; Nevada; Oregon; Washington;
24 Arizona; New Mexico; Alaska; and Washington, D.C.  The Center is actively involved in species and
25 habitat protection issues throughout North America and has more than 42,000 members, including
26 many members who reside and recreate in California.  One of the Center's primary missions is to

27
28

COMPLAINT                                   6

1  protect and restore habitat and populations of imperiled species, including from the impacts of logging
2  and climate change.

3      15. The Center's members and staff include individuals who regularly use and intend to
4  continue to use the Stanislaus National Forest, including the lands and waters that were affected by the
5  Rim fire and are now planned for logging as part of this Project.  These members and staff use the area
6  for observation, research, aesthetic enjoyment, and other recreational, scientific, spiritual, and
7  educational activities.  Many of the Center's staff and members use the area to observe or study
8  imperiled species like the California spotted owl, that, since the Rim fire burned, can be found in the
9  Project area.  These members' interests will be irreparably harmed by the planned logging in the fire
10 area, as they will no longer be able to visit and enjoy this area in its unlogged state, nor will they be
11 able to observe or attempt to observe the California spotted owl, or other species which use and are
12 dependent on these areas in their unlogged state.

13     16. The California Chaparral Institute (CCI) is a 501(c)(3) non-profit organization dedicated
14 to preservation of native shrubland habitats, including montane chaparral (shrubland habitat
15 interspersed throughout mountain forests, especially after fire) in California and throughout the world.
16 Their goal is to protect this habitat, and the wildlife species associated with it, by promoting an
17 understanding of and appreciation for this ecosystem. CCI's members would be irreparably harmed by
18 both direct and cumulative impacts from the Rim fire logging project and the reasonably foreseeable
19 related and connected project to artificially plant conifers and remove or otherwise eradicate shrubs.

20     17. This suit is brought by EII, the Center, and CCI on behalf of themselves and their
21 adversely affected members and staff.  Plaintiffs and their members' present and future interests in and
22 use of the Project areas are and will be directly and adversely affected by the challenged decision.
23 Those adverse effects include, but are not limited to: (1) impacts to native plants and wildlife and their
24 habitats within and around the Project area from logging, biomass removal, shrub reduction/removal,
25 soil compaction, noise, and human presence; (2) impacts to riparian areas and water quality; (3)
26 reduction and impairment of recreation opportunities; (4) impaired aesthetic value of forest lands,
27 trails, and landscapes caused by Defendants' logging; and (5) loss of scientific study opportunities with
28

regard to wildlife and natural post-fire conifer regeneration in areas proposed for logging.  In addition, Plaintiffs and their members and staff have an interest in ensuring that Defendants comply with all applicable laws, regulations, and procedures pertaining to the management of national forest lands.

18. Because Defendants' actions approving the Project violate several procedural and substantive laws, a favorable decision by this Court will redress the actual and imminent injury to Plaintiffs.

19. All Plaintiffs participated in the administrative process culminating in the issuance of the ROD by submitting comments on the Draft EIS ("DEIS") for the Project.  Defendants have requested and received (from the Washington, D.C. office of the Forest Service) an economic "emergency situation determination" (ESD) for the Project, which allows the agency to begin logging immediately after the decision is signed, without any further public input or process, such as administrative appeals or objections.  As such, Plaintiffs have exhausted all available administrative remedies.

20. Defendant Susan Skalski is the Forest Supervisor for the Stanislaus National Forest and is being sued in her official capacity.  Supervisor Skalski is directly responsible for forest management in the Stanislaus National Forest and for ensuring that all resource management decisions comply with applicable laws and regulations. Supervisor Skalski signed the ROD for the Rim Fire Recovery Project challenged here on August 28, 2014.  Supervisor Skalski officially resides in the greater Sonora area of California.

21. Defendant United States Forest Service is an agency of the United States Department of Agriculture.  The Forest Service is responsible for the administration and management of the federal lands subject to this action, including the implementation of NEPA, NFMA, the APA, and the statutes' implementing regulations.

COMPLAINT                                                                 8

# LEGAL BACKGROUND

## A. The National Environmental Policy Act

22. The National Environmental Policy Act ("NEPA") is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  NEPA's twin aims are to ensure that federal agencies consider the environmental impacts of their proposed actions and to ensure that agencies inform the public that environmental concerns have been considered.

23. NEPA requires "responsible [federal] officials" to prepare an environmental impact statement ("EIS") to consider the effects of each "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i).  Preparation of an EIS is mandated if "substantial questions are raised as to whether a project . . . *may* cause significant degradation of some human environmental factor." *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172, 1219-20 (9th Cir. 2008) (emphasis added).

24. The EIS must take a "hard look" at the impacts, and must not minimize adverse side effects of the proposed action. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998); *Ocean Advocates v. United States Army Corps of Engineers*, 361 F.3d 846, 865 (9th Cir. 2003); *Earth Island Institute v. U.S. Forest Service*, 442 F.3d 1147 (9th Cir. 2006).

25. Further, if significant new information or changed circumstances arise, the Forest Service must prepare a supplemental analysis. 40 C.F.R. § 1502.9(c); *Price Road Neighborhood Ass'n, Inc. v. U.S. Dept. of Transp.*, 113 F.3d 1505, 1508-1509 (9th Cir. 1997).

26. In the analysis of impacts, there must be a rational connection between the facts found and the decision made. *Ocean Advocates v. United States Army Corps of Engineers*, 361 F.3d 846, 865 (9th Cir. 2003); *Earth Island Institute v. U.S. Forest Service*, 442 F.3d 1147 (9th Cir. 2006).

27. Further, NEPA's implementing regulations require that the agency "shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions," and shall ensure the scientific accuracy and integrity of environmental analysis. *Id.* § 1502.24.  The agency must disclose if information is incomplete or unavailable and explain "the relevance of the incomplete or unavailable information to evaluating reasonably

foreseeable significant adverse impacts." *Id.* § 1502.22. The agency must also directly and explicitly respond to dissenting scientific opinion. *Id.* § 1502.9(b). Agencies must fully analyze a reasonable range of alternatives and the purpose and need for projects cannot be arbitrarily narrow. *Id.* § 1502.13, 1502.14.

## FACTUAL BACKGROUND

28.  The Rim fire burned in August 2014, garnering international news coverage and, while highlighted as one of the biggest fires in California, after the smoke cleared the reality of the fire is that it burned in a classic mixed-intensity mosaic pattern of low, moderate, and high intensity fire effects. About 40% of the fire occurred in non-conifer vegetation (mostly grassland, shrubland, oak woodland, and rock outcroppings/cliffs), and only one-third of the portion in conifer forest experienced high-intensity fire.

29.  High intensity burn areas create complex early seral forest, which is the rarest, most threatened forest habitat type in the Sierra Nevada, as letters signed by hundreds of scientists across the nation concluded. The Rim fire logging project heavily targets this habitat, and would remove the majority of it in the Rim fire area on the Stanislaus National Forest.

30.  The California spotted owl is a rare raptor that the Forest Service has designated as a Sensitive Species, meaning that the agency itself acknowledges that there is serious reason for concern about the viability of this species. The Forest Service is required to maintain viable populations of Sensitive Species, including the California spotted owl (U.S. Forest Service's Forest Service Manual (FSM), Amendment 2600-2005-1 (effective date: September 23, 2005), Sections 2670.12, 2670.22, 2670.32).

31.  Spotted owls have large territories, generally extending 1.5 kilometers or more from nest sites (Bond et al. 2009), whereas the Forest Service's administrative designation of "Protected Activity Centers" (PACs) only covers a minor portion of a given spotted owl territory – the area surrounding the nest (generally equating to an area 500-700 meters from nests). It has been well established that the PAC area alone is insufficient to maintain the needs of spotted owls.

COMPLAINT 10

32. On August 12, 2014, almost 2 months after the end of the public comment period as to the Draft EIS, but prior to any final decision, the Forest Service publicly released the 2014 California spotted owl surveys for the Rim fire area. This data showed an astoundingly high rate of spotted owl occupancy in the Rim fire area—including in territories with mostly high-intensity fire, contrary to assertions and assumptions in the Draft EIS (which were carried over into the Final EIS) that owls would avoid this area. At least 32 spotted owl pairs, and 5 spotted owl singles, were detected by the Forest Service during the spring and summer of 2014 within the Rim fire area. However, despite this new data and the analysis of this data provided to the Forest Service by spotted owl expert Monica Bond, and despite the fact that 37 occupied owl territories were targeted for logging by the Rim fire Project, the Forest Service did not conduct any supplemental NEPA analysis nor did it offer an additional public comment period as to this new data.

33. While the California spotted owl is not currently listed under the federal Endangered Species Act, the reasons identified in 2006 for not listing it are no longer valid. Specifically, more recent scientific studies published in 2013 and 2014, using additional data and robust statistical methodology, have very clearly demonstrated that California spotted owl populations are declining throughout the range of the subspecies. This recent science also shows that the declines are associated with areas characterized by past and ongoing extensive logging. In short, the California spotted owl is now understood to be in significant decline on Forest Service lands in the Sierras. This is why, for example, Tempel (2014) stated that his "results suggested that the U.S. Fish and Wildlife Service (2006) may need to reevaluate their recent decision not to list the California spotted owl under the Endangered Species Act because population declines are becoming apparent . . . ."

34. Furthermore, recent research has found that past assumptions about the relationship between owls and fire are not true. Not only are owls using intensely burned forest, the most recent scientific evidence establishes that California spotted owls preferentially select unlogged high-intensity fire areas in mature conifer forest for finding food (Bond et al. 2009). Based on the findings of this radio-telemetry study (wherein electronic receivers are placed on the backs of spotted owls to track their movements and where they spend most of their time), Bond et al. (2009) determined that in order

to protect these animals, post-fire logging should not occur within 1.5 km of owl core-use sites. *See also Conservation Cong. v. United States Forest Serv*., No. CIV. S-13-0832 LKK/DAD, 2013 U.S. Dist. LEXIS 127671, *20 (E.D. Cal. Sept. 6, 2013) ("Bond, in the cited papers, specifically recommended that 'post-fire logging be avoided within 1.5 kilometers (at least) of Spotted Owl nest sites.' . . . Also, [the Forest Service] identifies no literature that indicates that it would be appropriate to log within 1.5 km from the nest site.")  When post-fire logging occurs in spotted owl territories, all indications are that owl occupancy is diminished (Clark 2007, Bond et al. 2009, DellaSala et al. 2010, Bond 2011, Lee et al. 2012, Lee et al. 2013) – for example, Lee et al. (2012) found that 7 out of 8 owl territories were occupied after fires burned, but none of them remained occupied after post-fire logging occurred within the owl territories.

35.     Despite this, and more, new science as to the California spotted owl's relationship with burned forest, the Forest Service, in the Rim fire ROD/FEIS, allows logging to proceed in all occupied post-fire owl territories within the Rim Fire.  The Rim fire ROD/FEIS consistently avoid, misrepresent, and/or wrongly minimize the science regarding spotted owls and fire, and the impacts of post-fire logging, in order to justify the decision made.

36.     The Forest Service advertised its first post-fire timber sale in the Rim fire area yesterday, on September 3, 2014, and intends to advertise up to eight more timber sales over the next weeks and months, some into next year.  The Forest Service anticipates that logging could begin as early as the end of next week. The first contract is for a two year term expiring in 2016 and permits logging within 1.5 km of spotted owl territories.  The Forest Service is selling the timber for approximately 2 ½ cents per board foot.  The FEIS clearly states that the timber awarded in these contracts will remain economically viable beyond this year.

COMPLAINT                                     12

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of NEPA and the APA

### Failure to Prepare Supplemental Environmental Analysis

37. Plaintiffs incorporate by reference all preceding paragraphs.

38. Defendants' failure to prepare supplemental analysis in regard to the 2014 California spotted owl data, and the August 21, 2014 letter from Monica Bond and others, as required by NEPA, and NEPA's implementing regulations, 40 C.F.R. § 1502.9(c), represents agency action which is unlawfully withheld or unreasonably delayed, arbitrary, capricious, an abuse of discretion, in excess of statutory authority and limitations, and not in accordance with the law and procedures required by law. 5 U.S.C. § 706 (1) & (2).

39. 40 C.F.R. section 1502.9(c)(1) states that agencies must prepare supplemental analysis when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." Here, the survey results for the California spotted owl are clearly such information because they demonstrate widespread and exceptional owl presence in the Rim fire area that has not yet been properly addressed in relationship to the approved logging.

40. Further, to comply with NEPA, agencies are required to take a "hard look" at the environmental impacts of any project. Here, the DEIS did not, and could not, adequately examine the Project's impacts as to the California spotted owl because the data at issue here were not available. For example, the Rim fire DEIS must examine and analyze the impacts of logging within 1.5 km of owl nests/roosts/best available use sites, per this new survey data.

## SECOND CLAIM FOR RELIEF

### Violation of NEPA and the APA

### Failure to Take a Hard Look, To Adequately Explain Impacts, To Provide Necessary Information, And To Ensure Scientific Integrity

41. Plaintiffs incorporate by reference all preceding paragraphs.

42. Pursuant to NEPA, Defendants must take a "hard look" at the consequences, environmental impacts, and adverse effects, including cumulative effects, of proposed actions. 42 U.S.C. § 4331, 4332(2)(C); 40 C.F.R. § 1502.13-16; 40 C.F.R. § 1502.22; 40 C.F.R. § 1502.24; 40 C.F.R. § 1508.7-8; 40 C.F.R. § 1508.11; 40 C.F.R. § 1508.25.  Further, the Forest Service must not improperly minimize adverse side effects of planned logging, or brush aside adverse impacts with passing statements vaguely acknowledging some potential impacts.

43. The Forest Service failed to analyze, or adequately analyze, direct and indirect impacts, cumulative effects, and connected or cumulative actions of the Project with regard to California spotted owls, and thus improperly minimized adverse side effects of this massive logging project on this sensitive and declining species.  This includes but is not limited to the following: Defendants a) improperly minimized multiple lines of evidence showing dramatic declines in occupancy from post-fire logging; b) improperly minimized evidence regarding California spotted owl habitat, c) stated that the Project would not directly, or in conjunction with cumulative effects or connected or cumulative actions, threaten the viability of already-declining California spotted owl populations, and did so without ever determining the critical population threshold below which a viability threat occurs or whether the Project would push populations below that threshold; and d) failed to analyze cumulative effects and connected or cumulative actions from reasonably foreseeable plans for a reforestation and shrub reduction/removal project in the Rim fire area, which would further eliminate and degrade preferred spotted owl foraging habitat.  Defendants' decision to implement the Project without taking the requisite "hard look" at environmental impacts, cumulative effects and connected or cumulative actions with regard to California spotted owls violates NEPA and its regulations, and was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA. 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

**Plaintiffs respectfully request that this Court:**

1. Declare that Defendants violated NEPA, and the APA, and their implementing

regulations, in preparing and approving the Rim Fire Recovery Project and ROD/FEIS;

2. Enjoin Defendants from awarding or implementing timber sales for salvage logging and roadside "hazard" tree logging along Level 1 and 2 roads under the Rim Fire ROD/FEIS within 1.5 km of spotted owl territories found to be occupied in 2014 (this equates to approximately 40% of the logging planned under the ROD), until Defendants have complied with NEPA, the APA, and implementing regulations;

3. Award Plaintiffs their costs and attorneys fees under the Equal Access to Justice Act; and

4. Grant Plaintiffs such other and further relief as the Court deems just and equitable.

Respectfully submitted,

Dated: September 4, 2014

/s/ Justin Augustine

Justin Augustine (CA Bar No. 235561)
Center for Biological Diversity
351 California St., Suite 600
San Francisco, CA 94104
(415) 436-9682
Fax: (415) 436-9683
jaugustine@biologicaldiversity.org

Rachel M. Fazio (CA Bar No. 187580)
P.O. Box 897
Big Bear City, CA  92314
(530) 273-9290
rachelmfazio@gmail.com

Sean Malone (OR Bar No. 084060)
*pro hac vice to be requested*
Attorney at Law
259 E. Fifth Ave.
Suite 200-G
Eugene, OR 97401
(303) 859-0403
seanmalone8@hotmail.com

*Attorneys for Plaintiffs*