UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, EARTH ISLAND INSTITUTE and CALIFORNIA CHAPARRAL INSTITUTE,<br><br>    Plaintiffs,<br><br>    v.<br><br>SUSAN SKALSKI, in her official capacity as Forest Supervisor for the Stanislaus National forest, and UNITED STATES FOREST SERVICE, an agency of the Department of Agriculture<br><br>    Defendants. | No.  1:14-cv-01382-GEB-GSA<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**[*] |

Plaintiffs seek a temporary restraining order enjoining implementation of the United States Forest Service ("Forest Service")'s Rim Fire Recovery Project ("the Project") in the Stanislaus National Forest.[1] Plaintiffs specifically seek to "enjoin logging and logging associated activities"[2] related to

---

[*] Pursuant to E.D. Cal. R. 230(g), this matter is suitable for decision without oral argument.

[1] Plaintiffs argue logging for the Nevergreen Timber Sale is set to begin "as early as Thursday, September 18 2014" and the Double Fork timber sale, "which may be awarded on Monday, September 15, 2014 and operations within occupied owl territories could commence on Thursday, September 18, 2014." (Mot. 2:8-11.)

[2] Plaintiffs define "logging and logging related activities" as "tractor, skyline and or helicopter logging, as well as, roadside logging on roads not maintained for public use (maintenance Level 1 and 2 roads), and any other activities associated with the planned logging, within occupied California

1

the Forest Service's upcoming Nevergreen Timber Sale and Double Fork Timber Sale "within 1.5 km of occupied California spotted owl territories. . . . " (Pls. Mot. for Prelim. Inj. ("Mot.") 6:14-16, ECF No. 22.)

Plaintiffs argue a preliminary injunction is required since the Forest Service "violated NEPA's hard look requirement . . . by: a) misrepresenting and sidestepping crucial scientific evidence about serious adverse impacts [of the logging] to [the] California spotted owl. . . [and] b) concluding that the Rim fire logging project would not threaten the population viability of . . . the California spotted owl, without first determining whether the logging plan would push the owl's population below a critical threshold." (Mot. 9:23-10:2.) Plaintiffs' also argue the Forest Service violated NEPA when they "failed to meaningfully address [2014 California spotted owl survey data] in relationship to the Project's impact[]. . . . " (Mot. 19:12-14.)

I.   **BACKGROUND**

**The Rim Fire and Rim Fire Recovery Project:**

The motion concerns the following allegations.[3] "The Rim Fire [was] the third largest wildfire in California history

---

spotted owl territories." (Mot. 2:2-7.)

[3]   Plaintiffs move "to supplement the administrative record in this case with the declarations of Monica Bond, Derek Lee, and Dominick DellaSalla." (Pls.' Mot. to Supplement the AR 2:7-8, ECF No. 32.) However, "[e]ven considering the declarations, the [TRO] is denied at this time. Therefore, the Court [need not decide the motion to supplement the administrative record when deciding whether to issue a TRO.]" Willis v. Buffalo Pumps Inc., No. 12cv744 BTM (DHB), 2014 WL 1028437, at *3 n.1 (S.D. Cal. Mar. 17, 2014) (declining to reach evidentiary objections raised in connection with motion for summary judgment); accord Hernandez v. City of Oakley, No. C-11-02415 JCS , 2012 WL 5411781, at *3 n.4 (N.D. Cal. Nov. 6, 2012) ("The Court need not reach this [evidentiary] objection because, even assuming these [deposition] excerpts are admissible, it finds in favor of Defendants as to all of the remaining claims in this action.").

2

and the largest wildfire in the recorded history of the Sierra Nevada." AR B00111. In the summer of 2013, it burned more than 150,000 acres of National Forest including parts of the Stanislaus National Forest. AR B0013. The Rim Fire "resulted in areas of high, moderate and low vegetation burn severity." AR B00112-14. In response to the fire, the Forest Service proposed the Rim Fire Recovery Project. The Forest Service designed the Project to "help[] restore the land impacted by the Rim Fire. . . while simultaneously providing for public safety, ecological integrity, scientific research, and socio-economic benefits." AR 0009. The "proposed action . . . includes: salvage of dead trees[and] removal of hazard trees along roads open to the public and roads used to access and implement proposed treatments." AR B00121.

In connection with the Project, the Forest Service, published a Notice of Intent on December 6, 2013. AR B00121. "Interested parties submitted 4,200 total letters during the comment period including 174 unique individual letters and 4,026 form letters." AR B00128. The Forest Service's "public outreach began while the fire was still smoldering and continued up until the point of the" final decision. AR A00035.

The Forest Service organized "public open houses," "hosted Rim Fire Technical Workshops to share the development of alternatives status," "organized 24 tours into the Rim Fire area" for government officials and interested parties, and held a "30-day comment period." AR B00128. The Forest Service "asked for public comment on the DEIS [Draft Environmental Impact Statement]" and solicited public comments by "produc[ing]

3

materials for social media outlets" and "distribut[ing] some 60,000 newspaper inserts through the region explaining many of the proposed activities." AR B00128-129. "Responses to public comments were finalized during the development of the FEIS [Final Environmental Impact Statement ("EIS")]" and Record of Decision ("ROD"). AR B00129. The FEIS and ROD were published in August 2014. Of the four alternative courses of action considered for the Project, the Forest Service ultimately "selected Modified Alternative 4." AR A00016.

Modified Alternative 4 "approves salvage logging and fuel reduction on 15,383 acres including: 14,495 acres of ground based; 651 acres of helicopter; and 237 acres of skyline treatments." AR A00016. The Project covers around ten percent of the National Forest area impacted by the Rim Fire. AR A00016; B0013. Its "boundary is located within the Rim Fire perimeter within portions of the Mi-Wok and Groveland Ranger Districts on the Stanislaus National Forest." AR B00114. The "salvage harvest of trees initially killed by the Rim Fire" will be "accomplished through timbers sales" to occur "over the next 2 seasons, culminating in winter 2015." AR A00018.

**California Spotted Owl:**

"Forest fire is one of the most important issues affecting the [California] Spotted Owl's habitat." AR K01464. "California spotted owls will occupy landscapes that experience low- to moderate-severity wildfire, as well as areas with mixed-severity wildfire that includes some proportion of high-severity fire." AR K12141. They can "occupy territories and continue to reproduce in burned habitats, including those with severely

4

burned patches." AR K01464; see also B00449. However post-fire logging of burned trees within the California spotted owl's habitat, may result in "occupancy declines." AR K13093.

These raptors nest, roost and forage in parts of the Stanislaus National Forest impacted by the Rim Fire. AR B00003. The Forest Service considers California spotted owls a "sensitive species." AR B00432. They "have several characteristics that are broadly associated with increased species vulnerability." AR K12133."[A]pproximately 6,500 acres of salvage, and 8,500 acres of roadside logging, [as part of the Project] are slated to occur within 1.5 km of [California spotted] owl sites." AR B00003.

## II. LEGAL STANDARD

### A. Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff[s are] entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Id. at 20.

Further, the Ninth Circuit's "'serious questions' test" may be "applied as part of the four-element Winter test." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test test, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the

other two elements of the Winter test are also met. Id. at 1132.

**B. Review of Federal Agency Decisions Under the APA**

Plaintiffs argue the Forest Service violated the National Environmental Policy Act ("NEPA") when issuing the FEIS for the Project. (Compl. ¶¶ 37-43, ECF No. 1.) "NEPA aims to establish procedural mechanisms that compel agencies. . . to take seriously the potential environmental consequences of a proposed action." Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 864 (9th Cir. 2004). "NEPA imposes only procedural requirements, it does not dictate a substantive result." Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1355-56 (9th Cir. 1994).

"Judicial review of agency decisions under NEPA. . . is provided by the APA, which maintains that an agency action may be overturned only when it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Pit River Tribe v. U.S. Forest Service, 469 F.3d 768, 778 (9th Cir. 2006) (quoting 5 U.S.C. § 706 (2)(A)). "Review under this standard is narrow, and the reviewing court may not substitute its judgment for that of the agency." Earth Island Inst. v. U.S. Forest Service, 442 F.3d 1147, 1156 (9th Cir. 2006) (citation omitted) abrogated on other grounds by Winter, 555 U.S. 7.

Agencies must "[t]ak[e] a 'hard look" when creating an EIS, which "includes 'considering all foreseeable direct and indirect impacts. Furthermore, a 'hard look' should involve a discussion of adverse impacts that does not improperly minimize negative side effects.'" League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Service, 689 F.3d

6

1060, 1075 (9th Cir. 2012) (citing N. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 975 (9th Cir. 2006)). An agency has not taken a "hard look" where its decision was not "based on a consideration of the relevant factors, or [where] its actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998) (citing 5 U.S.C. § 706(2)(A)).

"Review under the arbitrary and capricious standard is narrow and [we do] not substitute [our] judgment for that of the agency. Rather, we will reverse a decision as arbitrary and capricious only if the agency relief on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." League of Wilderness Defenders, 615 F.3d at 1130 (citing Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008)(en banc). Deference to agency decision-making "is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise." League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen, 615 F.3d 1122, 1130 (9th Cir. 2010). "Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving. . . scientific matters." United States v. Alpine Land & Reservoir Co., 887 F.2d 207, 213 (9th Cir. 1989).

**III. Discussion**

**A. Likelihood of Success on the Merits**

Plaintiffs' Complaint is comprised of two claims that Defendants violated NEPA: (1) "Failure to Prepare Supplemental Environmental Analysis" and (2) "Failure to Take a 'Hard Look,' to Adequately Explain Impacts, To Provide Necessary Information, and To Ensure Scientific Integrity." (Compl. ¶¶ 37-43.) Plaintiffs argue either of these claims independently justify an injunction.

**1. Claim 1: Failure to Prepare Supplemental Environmental Analysis**

Plaintiffs argue a Supplemental EIS ("SEIS") is required before the Project proceeds since "the Forest Service has failed to meaningfully address [] new information in relationship to the Project's impacts where the new information" "unequivocally raises substantial questions regarding the Rim Project's impact on owls." (Mot. 19:12-13; 16:13-15.)

Plaintiffs argue the results of the Forest Service's 2014 owl survey "demonstrates widespread occupation of the Rim fire area by California spotted owls, which was not anticipated by the Forest Service," and indicates "the burned forest within the Rim fire area contains adequate amounts of suitable habitat for continued California spotted owl occupancy." (Mot. 14:21-24; 16:5-8.) Plaintiffs argue the FEIS does "not mention, let alone analyze, the 2014 Rim fire survey data and thus did not analyze what the impacts of the Project's logging would mean as to the 39 occupied owl territories. . . ." (Mot. 18:24-19:2; see also 18:5-11.)

8

The U.S. Forest Service must "prepare supplements to either draft or final environmental impact statements if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). "When determining whether to issue a supplemental EIS, an agency must 'apply a rule of reason,' not supplementing 'every time new information comes to light' but continuing to maintain a 'hard look' at the impact of agency action when the 'new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered.'" League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton, 752 F.3d 755, 760 (9th Cir. 2014) (citing Marsh v. Ore. Natural Res. Council, 490 U.S. 360, 373-74 (1989)).

Agency determinations regarding the necessity of a supplemental EIS are only to be set aside if arbitrary and capricious. N. Idaho Community Action Network v. U.S. Dep't of Transp., 545 F.3d 1147, 1154-55 (9th Cir. 2008). Where an agency documents a "reasoned decision" regarding "whether an SEIS is required," it withstands scrutiny. Great Old Broads for Wilderness v. Kimbell, 709 F.3d 836, 855 (9th Cir. 2013); see also Tri-Valley, 671 F.3d at 1130 ("because the [agency] determined in its supplemental report that the SA did not show a 'seriously different picture of the likely environmental harms stemming from the proposed project,' we must defer to the [agency's] finding that a supplemental REA was not required"); cf. Friends of the Clearwater v. Dombeck, 222 F.3d 552, 558 (9th

9

Cir. 2000) (finding the Forest Service failed to comply with its NEPA obligations where there was "no evidence in the record that, before this action, the Forest Service ever considered whether the [new data] were sufficiently significant to require preparation of an SEIS."). "Whether new information requires supplemental analysis is a 'classic example of a factual dispute the resolution of which implicates substantial agency expertise.'" Tri-Valley, 671 F.3d at 1130 (citing Marsh, 490 U.S. at 376).

Here, Plaintiffs are mistaken in their argument that the FEIS does "not mention, let alone analyze, the 2014 Rim fire survey data." (Mot. 18:24-19:2.) The Administrative Record includes the following information: "PACs . . . were . . . reestablished based on the 2014 survey results (EIS Chapter 3.15/California Spotted Owl: Affected Environment) [and] were redrawn to include the best available green habitat around the detections," (AR B00839) and "the recent spotted owl survey data . . . is information generated by the Forest Service, incorporated in the EIS, and shaped the final decision; therefore, the Forest Service considered this 'new information.'" AR A00038; see also AR B00713-714; A00027; A00038. The 2014 survey was completed, considered and incorporated into the EIS by the Forest Service; this information was integrated into the FEIS and there was no need for the agency to create a SEIS. See Headwaters, Inc. v. Bureau of Land Mgmt., 914 F.2d 1174, 1178 (9th Cir. 1990) (rejecting argument for SEIS where the "new" information was "encompassed by the terms of the [original] EIS" since the agency "specifically averted to the possibility that

10

there might be northern spotted owls in the [area]" and "discussed the impact of cutting upon the owl habitat, and adopted various measures recommended in the EIS to mitigate the impact upon any owls in the area."). The same is true of Bond's letter interpreting the survey data. AR A00038.

Additionally, the Forest Service explained in the ROD that the 2014 owl survey did not produce significant new information warranting a SEIS since "both the EIS and this decision recognize that owls forage in burned forests, and the EIS analyzes the effects of the various alternatives based on this understanding; therefore the underlying point raised in the August 21, 2014 comment letter, that implementing the Rim Recovery Project may adversely affect spotted owls in the area, was already addressed in the EIS and factored into this decision." JA A00038. Neither the 2014 owl survey results nor Bond's subsequent analysis produced data rising to the level of significant new information. The Forest Service's reasoned evaluation of the 2014 owl survey data is sufficient.

### 2. Claim 2: Failure to Take a Hard Look, To Adequately Explain Impacts, To Provide Necessary Information, And To Ensure Scientific Integrity

Defendants argue the Forrest Service "carefully considered the science proffered by Plaintiffs and simply reached different conclusion." Federal Defs. Opp'n to Pls. Appl. For TRO, 17:1-3, ECF No. 44.) Plaintiffs contend the Forest Service's argument is insufficient to satisfy the Forest Service's NEPA obligations since "justifications for not incorporating. . . information into [an] assessment of impacts must be reasonable

11

and demonstrate a rational connection between the facts found and the decision made," which the Forest Service did not do. (Mot. 10:5-16.) Plaintiffs specifically argue the Forest Service "failed to . . . acknowledge the importance of the 1.5 km radius surrounding a known owl site in meeting the foraging requirements of resident owls[,]" failed to "disclose to the public the . . . occupancy rate of resident spotted owls in the project area. . . [and] the location of the 30 owl territories which were discovered"; and "misrepresented the body of science [submitted] regarding owls and fire" by mischaracterizing or refusing to rely on some of the scientific evidence. (Mot. 10:20—11:2.)

Plaintiffs separately argue the Forest Service failed to comply with its NEPA obligations when it "concluded that the Rim Fire logging project would harm individual members of a Sensitive Species. . . but would not result in a trend toward federal listing under the Endangered Species Act" without "first determining whether the project would push the species below a critical population viability threshold." (Mot. 13:19-23.)

### i. Failed to Acknowledge or Disclose Important Information

Plaintiffs also argue the Forest Service "failed to . . . acknowledge the importance of the 1.5 km radius surrounding a known owl site in meeting the foraging requirements of resident owls" and failed to "disclose to the public the . . . occupancy rate of resident spotted owls in the project area. . . [and] the location of the 30 owl territories which were discovered" (Mot. 10:20-25.)

A court "may not 'flyspeck' and EIS . . . ." Half Moon

Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 508 (9th Cir. 1988). Instead, it "make[s] a pragmatic judgment about whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." Id.

The Forest Service adequately addressed in the Administrative Record comments and concerns regarding the 1.5 km radius surrounding a known owl site. AR B00001; B00827-830; B00836-837; E00973. Additionally, Plaintiffs fail to show how the failure to "disclose to the public the . . . occupancy rate of resident spotted owls in the project area" and "the location of the 39 owl territories which were discovered in the Rim Fire area and their special relationship to the planned logging," undermine the comprehensiveness of the report. The report clearly and repeatedly acknowledges the potential for the Project to impact the California spotted owl habitat. AR A00026-027; A00032-33; B 00001-002; B00109; B00130; B00165; B00445-461; B00741-742; B00824; B00839; B00842-844; C00336-360.

    **ii.  Misrepresented the Body of Science Regarding Owls and Fire**

Plaintiffs argue the Forest Service also "misrepresented the body of science regarding owls and fire" by mischaracterizing or refusing to rely some of the scientific evidence submitted. (Mot. 11:1-2.) Plaintiffs contend the agency's decision does not amount to a "battle of the experts" since "aside from ignoring or improperly dismissing the entire body of science related to owls use of burned areas . . . the Forest Service has no science of its own related to the relationship of California spotted owls and burned forests . . .

13

." (Mot. 12:24-28.) Plaintiffs challenge the Forest Service's comments critical of Clark (2007), Lee et al. (2012), Clark et al. (2013), DellaSala et al. (2010) and Monica Bond's August 21, 2014 letter to the Forest Service. (Mot. 11:2-12:13.)

The Ninth Circuit consistently holds "when specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp., 113 F.3d 1505, 1511 (9th Cir. 1997) (quoting Greenpeace Action v. Franklin, 14 F.3d 1324, 1332 (9th Cir. 1992)); Native Ecosystems Council v. U.S. Forest Service, 428 F.3d 1233, 1244 (9th Cir. 2005); Wetlands Action Network v. U.S. Army Corps of Eng'rs, 222 F.3d 1105, 1120-21 (9th Cir. 2000), abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Service, 630 F.3d 1173 (9th Cir. 2011).

Here, Plaintiffs misstate the Forest Service's reliance on expert data since the Forest Service does not ignore or dismiss the entire body of science on the subject. The Administrative Record shows the agency's careful consideration of and reliance on recent expert publications related to the California spotted owl. AR B00445 (citing "Keane 2014, Conner et al. 2013, Tempel and Gutiérrez 2013, and Tempel et al. 2014" as well as the Forest Service's "own recent estimates."). The Forest Service acknowledged the findings of Clark, Lee, Della Sala and Bond referenced by Plaintiffs and provided articulate and reasoned rationales for the weight they assigned to each report's conclusions. AR B00001; B00446; B00451 B00741-742; B00829-830;

14

B00836-838; A00038. Plaintiffs' arguments are insufficient show the agency's action fell outside the bounds of discretion afforded in 5 U.S.C. § 706(2)(A).

Regarding Clark (2007), which Plaintiffs argue the Forest Service mischaracterizes: although Plaintiffs' have a different interpretation than the Forest Service, the Clark (2007) report found "[o]wls residing inside the fire used all the available habitat including moderate and high severity burns (Figure 6.2), although habitat use <u>was dominated by low severity burns in NRF habitat</u>," which is consistent with the Forest Service's characterization of the report. AR K04467 (emphasis added); B00446. Given the high degree of deference afforded to an agency concerning matters within its expertise, Plaintiffs have not demonstrated either the likelihood of success on the merits or raised "serious questions" going to the merits.

### iii. **Failed to Make a Proper Determination as to Whether the Rim Fire Logging Project Would Push Spotted Owls Below a Critical Viability Threshold**

Plaintiffs also argue the FEIS departs from NEPA requirements since "Defendants concluded that the Rim Fire logging project would harm individual members of a Sensitive Species. . . but would not result in a trend toward federal listing under the Endangered Species Act; yet the agency did so without first determining whether the project would push the species below a critical population viability threshold." (Mot. 13:19-23.)

An agency EIS stating the proposed project "would have a negative impact" on a sensitive species "but would not result

15

in a trend toward federal listing" without providing a meaningful explanation, is insufficient evidence the agency took a "hard look." Earth Island Inst., 442 F.3d at 1172 abrogated on other grounds by Winters, 555 U.S. at 7.

Plaintiffs cite as evidence of the Forest Service's duty to determine whether the Project "would push spotted owls below a critical viability threshold," the Ninth Circuit's decision in Ecology Ctr. v. Austin, 430 F.3d 1057, 1067-68 (9th Cir. 2005). (Mot. 13:12-18.)

In Austin, the parties agreed "prior to [the fires at issue] there was a critical shortage of [the bird's] habitat" and the agency "considered the [birds] . . . to be 'at extreme risk.'" 430 F.3d at 1066. The agency determined the project "may contribute to a trend towards federal listing or cause a loss of viability to the population or species." Id. at 1066. Yet, the EIS "state[d] without meaningful explanation-that even though [the project] may negatively impact individual [birds], it will not likely result in a trend towards federal listing.'' Id. at 1067. Since further explanation was not provided in Austin, the Ninth Circuit stated: the EIS "fail[ed] to adequately explain the basis for the Forest Service's conclusion," and therefore the court "cannot even be certain that the [agency] determined and considered" all relevant factors. Id. at 1067.

Here, the situation is different since it has not been shown that the Forest Service previously determined the logging involved may contribute to a trend towards federal listing or cause a loss of viability to the California spotted owl population. Additionally, the Forest Service did more than state

16

without meaningful explanation that even though the Project may negatively impact individual birds, it will not likely result in a trend towards federal listing. AR B00460-461. The Forest Service recognized the "[p]roposed activities may affect spotted owls" since the land at issue is "still [a] viable and important owl habitat" and "[b]ecause the fire burned through 46 California spotted owl PACs, as well as thousands of acres of other critical habitat, retaining old forest structures (large snags and downed logs) is important at this time since future recruitment of these old forest features is not expected to occur until decades to centuries into the future." AR B00104; B00120; B00130.

The Forest Service demonstrated its appreciation of the Project's impact on the California spotted owl by identifying the indicators it used to "provide a relative measure of the direct and indirect effects [of the Project] to the spotted owl and to determine how well project alternatives comply with the Forest Plan Direction and species conservation strategies." AR B00452. Then, for each of the four proposed alternatives, the Forest Service carefully considered each indicator. AR B00453-458. After analyzing the data, the Forest Service gave a recommendation that each of the four alternatives "may affect individuals but is not likely to result in a trend toward Federal listing or loss of viability for the California spotted owl." AR B00460-461. Under each determination the Forest Service directly and methodically disclosed the rationale for its conclusion. AR B00460-461.

This review satisfies the Forest Service's obligations to provide a meaningful explanation in support of its decision and Plaintiffs fail to meet their burden of showing to show the

agency omitted a meaningful explanation for its decision or that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

### B. Irreparable Harm / Balance of the Equities / Public Interest

Plaintiffs fail to either show a likelihood of success or raise a serious question on the merits regarding any of their claims. Therefore, no discussion of the remaining three Winter factors is required. Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris, 729 F.3d 937, 944 (9th Cir. 2013) ("When "a plaintiff has failed to show the likelihood of success on the merits," the court "'need not consider the remaining three Winter elements.'") (citing DISH Network Corp., v. F.C.C., 653 F.3d 771, 776-77 (9th Cir. 2011); Haskell v. Harris, 669 F.3d 1040, 1053 (9th Cir. 2012); Advertise.com, Inc. v. AOL Advertising, Inc., 616 F.3d 974, 982 (9th Cir. 2010); Doe v. Reed, 586 F.3d 681 n.14 (9th Cir. 2009) aff'd on other grounds, 561 U.S. 186 (2010).

### III. CONCLUSION

For the reasons stated above, Plaintiffs' motion for a temporary restraining order is DENIED.

Dated: September 16, 2014

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge

18