1

2

3

4                    UNITED STATES DISTRICT COURT

5                   EASTERN DISTRICT OF CALIFORNIA

6

7  CENTER FOR BIOLOGICAL              No.  1:14-cv-1382-GEB-GSA
   DIVERSITY, EARTH ISLAND
8  INSTITUTE, and CALIFORNIA
   CHAPPARAL INSTITUTE,
9                                     **ORDER DENYING PLAINTIFFS' MOTION**
                Plaintiffs,           **FOR PRELIMINARY INJUNCTION AND**
10                                    **MOTION TO SUPPLEMENT THE**
                                      **ADMINISTRATIVE RECORD**
11      v.

12 SUSAN SKALSKI, in her
   official capacity as Forest
13 Service Supervisor for the
   Stanislaus National Forest,
14 and UNITED STATES FOREST
   SERVICE, an agency of the
15 Department of Agriculture,

16              Defendants.

17

18         Plaintiffs   Center   for   Biological   Diversity,   Earth

19 Island    Institute,    and    California    Chapparal    Institute

20 (collectively "Plaintiffs") move  for  a  preliminary  injunction

21 enjoining  logging  in  a  portion  of  what  is  called  the  Rim  Fire

22 Recovery  Project  ("the  Project");  specifically  Plaintiffs  seek  to

23 prevent  logging  within  1.5  km  of  eight  owl  territory  centers  that

24 are  part  of  the  Nevergreen,  Double  Fork,  and  Triple  A  timber

25 sales  in  the  Rim  Fire  area  of  the  Stanislaus  National  Forest.

26 (Pls.' Mot. Prelim. Inj. "Mot." 2:4-3:13, ECF No. 52.) Plaintiffs

27 also  move  for  an  order  requiring  that  three  declarations

28 supplement  the  administrative  record  ("AR").  (Mot.  Supplement  AR

                                     1

1  ("Mot. Supp." ECF No. 32.) Defendants Skalski and the United

2  States Forest Service ("Forest Service") (collectively

3  "Defendants") oppose both motions. (Opp'n Mot. Prelim. Inj., ECF.

4  No.61; Fed. Defs. Opp'n Mot. Supp. AR, ECF No. 49.)

5                    **I.    BACKGROUND**

6  **The Rim Fire and Rim Fire Recovery Project:**

7              The  motions  concern  the  following  background

8  information in the administrative record. The Rim Fire began in

9  August 2013 in the Stanislaus National Forest near Yosemite

10 National Park. AR A00011. The fire burned for several weeks and

11 was "the third largest wildfire in California history and the

12 largest wildfire in the recorded history of the Sierra Nevada."

13 AR A00011, B00111. It burned more than 150,000 acres of National

14 Forest and "resulted in areas of high, moderate and low

15 vegetation burn severity." AR B00112-14; see also A00015.

16             The Forest Service states its proposed Rim Fire

17 Recovery Project is its response to the fire and the fire's

18 impact on Stanislaus National Forest. The Forest Service further

19 states it designed the Project to "help[] restore the land

20 impacted by the Rim Fire. . . while simultaneously providing for

21 public safety, ecological integrity, scientific research, and

22 socio-economic benefits." AR A00009. The "proposed action . . .

23 includes: salvage of dead trees[and] removal of hazard trees

24 along roads open to the public and roads used to access and

25 implement proposed treatments." AR B00121.

26             The Forest Service's "public outreach began while the

27 fire was still smoldering and continued up until the point of

28 the" final decision to implement the Project. AR A00035.

1        In connection with the Project, the Forest Service,
2   published a Notice of Intent on December 6, 2013 and sought
3   "information, comments and assistance from federal, state and
4   local agencies and individuals or organizations . . . affected by
5   the proposed action." AR B00121, B00127. "Interested parties
6   submitted 4,200 total letters during the comment period including
7   174 unique individual letters and 4,026 form letters." AR B00128.

8        The 30-day public comment period on the Project DEIS
9   [Draft Environmental Impact Statement ("EIS")] began on May 16,
10  2014 with publication of the Notice of Availability in the
11  Federal Register and during this period the Forest Service
12  received 5,589 comment letters on the DEIS including "154 unique
13  individual letters and 5,435 form letters from 8 different
14  organized groups." AR B00129.

15       The Forest Service organized "public open houses,"
16  "hosted Rim Fire Technical Workshops" and "organized 24 tours
17  into the Rim Fire area" for government officials and interested
18  parties" AR B00128. The Forest Service solicited public comments
19  by "produc[ing] materials for social media outlets" and
20  "distribut[ing] some 60,000 newspaper inserts through the region
21  explaining many of the proposed activities." AR B00128-129.
22  "Responses to public comments were finalized during the
23  development of the FEIS [Final Environmental Impact Statement]"
24  and Record of Decision ("ROD"). AR B00129. The FEIS and ROD were
25  published in August 2014. Of the four alternative courses of
26  action considered for the Project, the Forest Service ultimately
27  "selected Modified Alternative 4." AR A00016.

28       Modified Alternative 4 "approves salvage logging and

fuel reduction on 15,383 acres including: 14,495 acres of ground based; 651 acres of helicopter; and 237 acres of skyline treatments." AR A00016. The Project covers around ten percent of the National Forest area impacted by the Rim Fire. AR A00016; B0013. Its "boundary is located within the Rim Fire perimeter within portions of the Mi-Wok and Groveland Ranger Districts on the Stanislaus National Forest." AR B00114. The "salvage harvest of trees initially killed by the Rim Fire" will be "accomplished through timbers sales" to occur "over the next 2 seasons, culminating in winter 2015." AR A00018.

**California Spotted Owl:**

"California spotted owls . . . have been at the forefront of Sierra Nevada management and conservation debates for 25 years . . . ." AR K12132. The owls are "a territorial species with each pair defending an exclusive territory." AR K12139. The Forest Service considers California spotted owls a "sensitive species" as they "have several characteristics that are broadly associated with increased species vulnerability." AR B00432, K12133. "The primary driver for [California spotted owl] nest habitat loss is . . . wildfire." AR B00448. The Rim fire "destroyed . . . one quarter of the areas where spotted owls . . . roost and nest" in the Stanislaus National Forest. AR A00013, A00025.

"The most recent estimate of population size for California spotted owls in the Sierra Nevada reported 1,895 owl sites, with 1,299 sites on National Forest System lands." AR B00445.

Their nests are typically located in areas with "70

4

percent or greater canopy cover," however the owls "use a broader range of vegetation conditions for foraging than they do for nesting . . . include[ing] post-fire habitats" like the high-severity burn areas found in the Rim Fire area. AR B00445; see also B00003, K12136, K45474, K43093. "Recent research indicates that prey species [for the California spotted owl such as gophers and flying squirrels] may be abundant and available in the post-fire environment." AR B00450.

"[A]pproximately 6,500 acres of salvage, and 8,500 acres of roadside logging, [as part of the Project] are slated to occur within 1.5 km of [California spotted] owl sites" in the Stanislaus National forest. AR B00003.

The Forest Service addressed the likelihood that the Project would have a negative impact on individual spotted-owls in its ROD. Their discussion included the following:

> In the short term, salvage logging and fuel reduction actions will undoubtedly affect individual animals and patches of habitat. However, in the long term, failing to reduce the extreme fuel load on the landscape increases the likelihood of having another extreme fire similar to the Rim Fire. The Rim Fire burned through forty six California spotted owl Protected Activity Centers (PACs) . . . destroying some of these Sensitive species' important old-forest habitat. And, this is just a small snapshot of the wildlife impacts from the Rim Fire. . . . So, being faced with the choice of causing minimal short-term adverse effects to wildlife or increasing the risk of serious long-term impacts to wildlife, [the Forest Service] opted for the former, with the strong conviction that doing so is better for wildlife.

AR A00025.

///

5

1        **II.   MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

2              Plaintiffs argue that a declaration from each of the

3   following named individuals should supplement the administrative

4   record because supplementation is necessary (1) for determining

5   whether the Forest Service considered all relevant factors and

6   explained its decision and (2) for the purpose of explaining

7   technical terms or complex subject matter (Mot. to Supp. 4:8-

8   10)[1]: Monica Bond (ECF No. 22-15), Derek Lee (ECF No. 22-16), and

9   Dominick DellaSala (ECF No. 22-17).

10             Each declarant discusses his or her qualifications and

11  experience in wildlife biology, interprets his or her own

12  research regarding California spotted owl populations and

13  habitat, discusses other research in the field, and addresses

14  conclusions reached by the Forest Service in the FEIS and the

15  logic underpinning those conclusions.

16             National Environmental Policy Act ("NEPA") claims are

17  reviewed under the judicial review provision of the

18  Administrative Procedure Act, which requires consideration of

19  "the whole record or those parts of it cited by a party."

20  5 U.S.C. § 706.  "[T]he focal point for judicial review should be

21  the administrative record already in existence, not some new

22  record made initially in the reviewing court." Fla. Power & Light

23  Co. v. Lorin, 470 U.S. 729, 743 (1985).

24             The Ninth Circuit recognizes four exceptions where

25  _____

26  [1]        Defendants submitted their own declarations arguing "if the Court
    does consider [Plaintiffs'] declarations, it should review them alongside the
    accompanying Declarations of [Forest Service employees] Marcie Baumbach and
27  Patricia Manley."  (Fed. Defs. Opp'n Pls. Mot. Prelim. Inj. 2:18-21, ECF No.
    61.) Since Plaintiffs' motion to supplement the administrative record is
28  denied, the government's motion is denied as moot.

supplementing an administrative record may be justified: "Courts may review . . . extra-record materials [like the Bond, Lee and DellaSala declarations] only when: (1) it is necessary to determine whether the agency has considered all relevant factors and explained its decision; (2) the agency has relied on documents not in the record, (3) supplementing the record is necessary to explain technical terms or complex subject matter, or (4) plaintiffs make a showing of bad faith." City of Las Vegas v. F.A.A., 570 F.3d 1109, 1116 (9th Cir. 2009). "Though widely accepted, these exceptions are narrowly construed and applied" to ensure they do not undermine the general rule limiting review to the administrative record. The Lands Council v. McNair, 537 F.3d 981, 1030 (9th Cir. 2008).

Plaintiffs contend the Bond, Lee and DellaSala declarations are admissible under the first and third Lands Council exceptions. (Dkt. 61, 2:18-21.)

**A.   Necessary to Determine Whether the Agency has Considered all the Relevant Factors and Explained its Decision**

The "relevant factors" exception only applies where supplementing the record is necessary. Where "[t]he record contains sufficient information to explain how the [agency used the information before it] and why it reached its decision," the exception does not apply. Cook Inletkeeper v. U.S. EPA, 400 F. App'x 239, 240-41 (9th Cir. 2010).

A court should supplement the record when the agency "fails[s] to consider a general subject matter . . . , not when specific hypotheses and/or conclusions are omitted from

7

consideration. To hold otherwise would allow Plaintiffs to drive a truck through what is supposed to be a narrow exception to the record review rule." In re Delta Smelt Consol. Cases, 1:09-CV-1053 OWW DLB, 2010 WL 2520946, at *6 (E.D. Cal. June 21, 2010). Extra-record materials are not necessary where "the facts and documents referenced in the [extra-record material] are already in the administrative record." Quechan Tribe of the Ft. Yuma Indian Reservation v. U.S. Dep't of the Interior, 12CV1167-GPC PCL, 2012 WL 5512383, at *2 (S.D. Cal. Nov. 14, 2012).

Here, the Bond, Lee and DellaSala declarations are not necessary to determine whether the Forest Service considered all the relevant factors and explained its decision since Plaintiffs have not identified any research they allege the Forest Service failed to consider that is not itself contained in the administrative record. Where the studies themselves are in the record, it is not necessary to rely on external declarations when determining whether the Forest Service properly considered the information. Therefore, this portion of the Plaintiffs' motion to supplement the administrative record is denied.

**B.   Necessary to Explain Technical Terms or Complex Subject Matter**

Declarations may be admissible where they "aid a layperson's understanding of the basic concepts involved" in the motion, WildEarth Guardians v. Salazar, CV-09-00574PHXFJM, 2009 WL 4270039 (D. Ariz. Nov. 25, 2009), and where the proponent identifies which issues "can [only] be explained by supplemental evidence." U.S. v. Iron Mountain Mines, Inc., 987 F. Supp. 1250, 1262 (E.D. Cal. 1997). Supplementation is inappropriate if

offered to "suggest that [the federal agency] did not give [some information] sufficient weight."   <u>In re Delta Smelt Consol. Cases</u>, 2010 WL 2520946, at *6.

Here, Plaintiffs fail to identify which basic concepts or issues relevant to their motion cannot be understood through consideration of the administrative record alone. Rather than providing context, the declarations represent an attack on the Forest Service's conclusions. <u>See</u> Bond Decl. ¶ 4 ("I am presenting this declaration to . . . assist the court by illuminating where the Forest Service's ROD/FEIS fail to consider factors relevant to the impacts this project will likely have on the California spotted owl.") ¶16 ("When the Forest Service states that not all California spotted owls foraging habitat in the Rim Fire area will be logged, this is meaningless for two reasons"), ¶18 ("At every turn, the Forest Service has consistently misrepresented, minimized or improperly ignored the evidence submitted by myself . . . .); Lee Decl. ¶ 14 ("The Forest Service notes. . . several measures that they characterize as mitigation for California spotted owls. However, none of these are meaningful . . . .").

Plaintiffs have not shown that any referenced declaration is necessary for understanding any complex or technical matter.   Therefore, Plaintiffs' motion to supplement the administrative record is denied.

### III.    MOTION FOR PRELIMINARY INJUNCTION

#### A.   Legal Standard for Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff

1  is entitled to such relief." <u>Winter v. Natural Res. Def. Council,</u>
2  <u>Inc.</u>, 555 U.S. 7, 22 (2008).

3        A plaintiff seeking a preliminary injunction
       must establish [1] that he is likely to
4        succeed on the merits, [2] that he is likely
       to suffer irreparable harm in the absence of
5        preliminary relief, [3] that the balance of
       equities tips in his favor, and [4] that an
6        injunction is in the public interest.

7  <u>Id</u>. at 20.

8        Further, the Ninth Circuit's "'serious questions' test"
9  may be "applied as part of the four-element <u>Winter</u> test."
10 <u>Alliance for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1131-32
11 (9th Cir. 2011). "[I]f a plaintiff can only show that there are
12 serious questions going to the merits . . . then a preliminary
13 injunction may still issue if the 'balance of the hardships tips
14 sharply in plaintiffs favor' and the other two <u>Winter</u> factors are
15 satisfied." <u>Shell Offshore Inc. v. Greenpeace Inc.</u>, 709 F.3d
16 1281, 1291 (9th Cir. 2013) (quoting <u>Cottrell</u>, 632 F.3d at 1135.).
17 Where a plaintiff fails to demonstrate even serious questions
18 going to the merits of his or her claim, the court need not
19 consider the remaining <u>Winter</u> factors. <u>Association des Eleveurs</u>
20 <u>de Canards et d'Oies du Quebec v. Harris</u>, 729 F.3d 937, 944 (9th
21 Cir. 2013).

22      **B.  Likelihood of Success on the Merits**

23      Plaintiffs allege two NEPA claims: (1) Failure to
24 Prepare Supplemental Environmental Analysis and (2) Failure to
25 Take a "Hard Look," to Adequately Explain Impacts, To Provide
26 Necessary Information, and To Ensure Scientific Integrity.
27 (Compl. ¶¶ 37-43, ECF No. 1.) Plaintiffs argue either claim
28 justifies an injunction.

1    Plaintiffs' underlying NEPA claims are reviewed under
2  the Administrative Procedures Act ("APA"), which allows the court
3  to set aside an agency action only where the action was
4  "arbitrary, capricious, an abuse of discretion, or otherwise not
5  in accordance with the law." 5 U.S.C. § 706(2)(A). "Review under
6  this standard is narrow, and the reviewing court may not
7  substitute its judgment for that of the agency." Earth Island
8  Inst. v. U.S. Forest Service ("Earth Island II"), 442 F.3d 1147,
9  1156 (9th Cir. 2006) (citation omitted) abrogated on other
10 grounds by Winter, 555 U.S. at 7.

11    However, when reviewing the "predominantly legal
12 question[]" of whether new information is "a circumstance
13 requiring public proceedings and supplemental EISs under NEPA. .
14 . the applicable standard of review . . . is reasonableness."
15 Alaska Wilderness Recreation & Tourism Ass'n. v Morrison, 67 F.3d
16 723, 727 (9th Cir. 1995).

17    **1.   Failure to Prepare a Supplemental Environmental**
18         **Impact Statement (SEIS)**

19    Plaintiffs argue NEPA requires the Forest Service to
20 prepare a SEIS before it proceeds with the Project since "the
21 Forest Service has failed to meaningfully address [the Forest
22 Service's 2014 spotted owl survey data] in relationship to the
23 Project's impacts" on spotted owl habitat, notwithstanding that
24 the survey data "unequivocally raises substantial questions
25 regarding the Rim Project's impact on owls." (Mot. ISO Pls. Req.
26 TRO "Mot. TRO" 19:12-13; 16:13-15, ECF No. 22.) Plaintiffs argue
27 since the FEIS and ROD lack a discussion of "what surveys were
28 done, where they were done, what the outcome was for all of the

1  owl sites (not just a minor subset), or what the results mean for

2  owls on the Rim fire landscape, even though the information was

3  available to the Forest Service before they issued the Final EIS

4  for this project or signed the Record of Decision," NEPA requires

5  the Forest Service to prepare a SEIS. (Reply Mem. ISO Pls. Mot.

6  Prelim. Inj. "Reply" 2:20-25, ECF No. 63.)

7       Plaintiffs contend the Forest Service's references to

8  the 2014 survey in the FEIS and ROD are insufficient because they

9  "do not actually mention the entirely of the survey results[,]

10  provide even the most basic information necessary for context" or

11  "assess[] how much salvage logging will occur within . . . owl

12  territories" and "[a]s a result, the public has no meaningful

13  information with which to understand the very basics about actual

14  owl presence in the Rim Fire area." (Reply 3:4-6, 12-16, 4:7-9.)

15  Plaintiffs consider the ROD's statement that "both the EIS and

16  this [ROD] recognize that owls forage in burned forests, and the

17  EIS analyzes the effects of the various alternatives based on

18  that understanding," "hollow" "because when. . . site-specific

19  data exists, the only appropriate way to analyze the effects of

20  the proposed logging on owl foraging habitat is to examine the

21  logging units in relationship to where the owls actually are."

22  (Reply 4:12-16.) Plaintiffs' argue the survey results call out

23  for a SEIS even more strongly when viewed in connection with

24  "several other factors," related to spotted owls, including the

25  declining status of the owls in area where logging occurs, and

26  the area's designation as an "Area of Concern" for the California

27  spotted owl. (Reply 6:3-7.)In discussing the need for

28  supplemental analysis in light of new information, the Supreme

12

Court has held:

> It would be incongruous with [NEPA's] approach to environmental protection, and with the Act's manifest concern with preventing uninformed action, for blinders to adverse environmental effects, once unequivocally removed [through the notice and comment procedure], to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval.

Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989). However, the Supreme Court also stated in Marsh "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decision-making intractable . . ." Id. at 373. Instead, NEPA requires the Forest Service to create a SEIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impact." 40 C.F.R. § 1502.9(c)(1)(ii) (emphasis added).

Where an agency "provide[s] a reasoned evaluation . . . as to why a []SEIS [is] not necessary," it withstands scrutiny. Neighbors of Cuddy Mountain v. U.S. Forest Serv., 141 F.3d 1177 (9th Cir. 1998).

Here, Plaintiffs have not raised serious questions concerning their argument that the 2014 survey data requires the Forest Service to prepare a SEIS. The Forest Service is only required to create a SEIS in light of the development of significant new information. 40 C.F.R. § 1502.9(c)(1)(ii). Plaintiffs cite no binding legal authority supporting their argument that "where, as here, site-specific data exists, the only appropriate way to analyze the effects of the proposed

logging on owl foraging habitat is to examine the logging units in relationship to where the owls actually are." (Reply 4:14-16.).

The Forest Service did not ignore the 2014 survey data. The agency reestablished six Protected Activity Centers ("PACs") in the forest based on the survey results. AR A0025, A0027, A00038, B00125, B00829. The decision to incorporate the results of the survey into the Project is evidence the Forest Service reviewed and understood the data in context before it ultimately determined that the survey was not significant new information. The Forest Service explained its reasoning in the administrative record where it responded to Bond's August 21, 2014 letter concerning the 2014 survey data as follows:

> Both the EIS and [the ROD] recognize that owls forage in burned forests, and the EIS analyzes the effects of the various alternatives based on this understanding; therefore, the underlying point raised in [Bond's letter], that implementing the [Project] may adversely affect spotted owls in the area, was already addressed in the EIS and factored into this decision.

AR A00038.

Although the Forest Service's analysis of the survey data is different from Plaintiffs' analysis, what the Forest Service states about the survey data is reasonable and satisfies the relevant standard of review. "The mere presence of expert disagreement does not violate NEPA because 'experts in every scientific field routinely disagree.'" Sierra Forest Legacy v. Sherman, 646 F.3d 1161, 1182 (9th Cir. 2011) (citing Lands Council, 537 F.3d at 1101)).

Additionally, even though the 2014 survey data was not

significant enough to warrant an SEIS, the Forest Service did not ignore the survey. The agency reestablished six Protected Activity Centers ("PACs") in the forest based on the survey results. AR A0025, A0027, A00038, B00125, B00829. The decision to incorporate the results of the survey into the Project is evidence the Forest Service reviewed and understood the data in context before determining the results were not significant new information.

Therefore, Plaintiffs' motion for a preliminary injunction based on the Forest Service's failure to conduct a SEIS is denied.

**2.   "Hard Look"**

Plaintiffs argue the Forest Service violated its NEPA obligations by failing to take a "hard look" at the comments and evidence submitted during the review period. Specifically, Plaintiffs argue the Forest Service's discussion of several studies concerning the California spotted owl's relationship with burned forest were either misinterpreted or ignored for arbitrary and capricious reasons and that the Forest Service failed to adequately justify its determination that while the Project would harm individual spotted owls, it would not result in a trend toward federal listing under the Endangered Species Act.

**a.   Failure to Acknowledge or Disclose Important Information and Misrepresentation of the Relevant Science**

Plaintiffs argue the Forest Service did not assess the Project's impact "on resident California spotted owls based upon the findings of the scientific" evidence before them since the

agency used arbitrary and capricious reasons to disregard that evidence and the Forest Service's reference to the studies at issue "do[es] not represent an incorporation of the information on adverse effects of post-fire logging into the impact analysis." (Reply 7:5-8, 8:1-2) (emphasis omitted).   They challenge the Forest Service's comments critical of Clark (2007), Lee et al. (2012), Clark et al. (2013), DellaSala et al. (2010) and Monica Bond's August 21, 2014 letter to the Forest Service. (Mot. 11:2-12:13.)

Plaintiffs also contend that the passages in the administrative record the Court used in support of its order denying Plaintiffs' temporary restraining order on this point show the Forest Service relying on "science which has studied the spotted owl's relationship with unburned forest, while systematically dismissing [on arbitrary and capricious grounds] . . . the main body of science which has investigated how owls use burned forests and the effects of logging high- and moderate-intensity burned areas within occupied owl territories." (Reply. 7:11-19) (emphasis omitted).

Plaintiffs argue that "nowhere in any of [the pages where the Forest Service references the Project's impact on California spotted owl habitat] can the reader find an analysis of the effects of post-fire logging within 1.5 km of the 39 spotted owl sites found to be occupied in 2014 in the Rim fire, on the occupancy of those sites, based upon the actual physical locations chosen by the owls themselves in 2014 relative to logging units." (Reply 8:24-9:1.)

Plaintiffs also take issue with the Forest Service's

16

characterization of Clark (2007) arguing that although the Forest Service claims the study "found that high-intensity fire areas in old/mature forest are 'poor habitat for spotted owls' because the level of use was relatively 'low,'" the study actually "indicat[es] that [high-intensity fire areas in old/mature forest] is high quality habitat, under the most basic scientific principles of wildlife biology." (Reply 9:14-21.)

Plaintiffs contend their claim does not amount to an impermissible "battle of the experts" between the Forest Service and the Bond, Clark, Lee and DellaSala studies because "there are no 'competing scientific analyses' here to weigh. . . ." (Reply 10:12-13.)

"NEPA requires not that an agency engage in the most exhaustive environmental analysis theoretically possible, but that it take a 'hard look' at the relevant factors." N.W. Envt'l Advocates v. Nat'l Marine Fisheries Serv., 460 F.3d 1125, 1139 (9th Cir. 2006). A "hard look" "includes 'considering all foreseeable direct and indirect impacts. Furthermore, a 'hard look' should involve a discussion of adverse impacts that does not improperly minimize negative side effects.'" League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv., 689 F.3d 1060, 1075 (9th Cir. 2012) (citing N. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 975 (9th Cir. 2006)).

The standard of review under § 706 assesses "whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the action. Churchill Cnty. v. Norton, 276 F.3d 1060, 1071 (9th Cir.

2001). An agency action satisfies its obligations under §706 when its conclusions are "reasonably justified. . . based upon record evidence and additional analysis of site-specific factors." Tri-Valley CAREs v. U.S. Dep't of Energy, 671 F.3d 1113, 1126 (9th Cir. 2012).

"When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Marsh, 490 U.S. at 378; see also Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp., 113 F.3d 1505, 1511 (9th Cir. 1997) (quoting Greenpeace Action v. Franklin, 14 F.3d 1324, 1332 (9th Cir. 1992)); Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1244 (9th Cir. 2005); Wetlands Action Network v. U.S. Army Corps of Eng'rs, 222 F.3d 1105, 1120-21 (9th Cir. 2000), abrogated on other grounds by Wilderness Society v. U.S. Forest Serv., 630 F.3d 1173 (9th Cir. 2011).

Here, the administrative record shows the agency did not "disregard" Lee (2012), Clark (2013), DellaSala (2010) and the August 21, 2014 Bond letter. The Forest Service discussed the application of these studies to the Project by reviewing their findings and acknowledging the limits of their conclusions. For example, the Forest Service relied on Lee et al. (2012) to state "Recent research indicates that California spotted owls will occupy landscapes that experience low-to moderate-severity wildfires, as well as areas with mixed-severity wildfire that include some proportion of high-severity fire," that "[p]ost-fire logging may adversely affect rates of owl occupancy," and that

"[a] growing body of evidence indicates that spotted owls persist within fire-affected landscapes." AR B00446, 451, 455. But the FEIS cautions against extrapolating too much from Lee et al. (2012) because "[a]t the very least, the small sample size of 8 [owl] sites with significant habitat loss [in the Lee study] is too small to support a general blanket statement that the high severity fires that affect 80-100 percent of owl core habitat have not reduced owl occupancy in the Sierra Nevada." AR B00829. This caution—rather than showing an arbitrary and capricious review—demonstrates the agency's analysis of site-specific factors in compliance with § 706.

The same is true for Clark (2013). The Forest Service clearly reviewed and analyzed this research and the limits of its applicability. The FEIS states: "Clark et al. (2013) summarized the results provided by the few studies that have been conducted on spotted owls in burned landscapes and noted that the results were equivocal. Thus, uncertainties remain regarding long-term occupancy and demographic performance of spotted owls at burned sites." AR B00446. It also notes "Clark et al. (2013) were unable to separate the impacts of wildfire from land management activities" (AR B00451,) and "Clark et al. (2013) compared owl site occupancy in burned and salvaged landscapes to unburned landscapes. . . . [but] did not explicitly test the effects of salvage logging; rather it was combined with high severity fire as a source of habitat loss in treatment landscapes." AR B00829. The FEIS incorporated Clark et al. (2013) and applied its findings in context with the variables at play in the Rim fire area.

1    The Forest Service also adequately considered DellaSala
2  (2010). DellaSala (2010) is not a peer-reviewed publication, but
3  a two paragraph Letter to the Editor which argues "science shows
4  that fire can enhance habitat for owls' small mammal prey" and
5  that "spotted owls prefer dense, old forests with high canopy
6  cover for nesting, and preferentially select unlogged severely
7  burned forests for foraging." AR O00181-182. The only citation
8  for this assertion in the Letter is to Bond et al. (2009), which
9  is a study already considered and discussed in the FEIS. AR
10  B00446, B00833-834 B00844. The Forest Service was not arbitrary
11  or capricious when it determined DellaSala's Letter, "did not
12  include analysis or qualitative evidence that could be used in
13  the project analysis." AR B0837.

14    Finally, Bond's August 21, 2014 letter was similarly
15  addressed in the administrative record. The letter is dated
16  August 21, 2014, but was not received by the Forest Service until
17  August 27, 2014, "after the FEIS had been completed and the
18  Forest Service had issued a Proposed Record of Decision," which
19  is why FEIS does not address it. AR B00001. Nevertheless, the
20  Forest Service employee Maria Benech articulated reasons why the
21  letter did not warrant changes to the proposed decision in the
22  administrative record. AR B00001. The "FEIS and ROD recognize
23  that owls remaining in the Rim Fire area may forage in the burned
24  areas, including within 1.5 km of occupied sites. Therefore, this
25  issue has been fully considered in the NEPA analysis and
26  decision-making process." AR B00001. The Forest Service publicly
27  presented this same analysis in the ROD, which was issued after
28  it received Bond's letter, finding "the underlying point raised

1   in the August 21, 2014 comment letter, that implementing the Rim

2   Recovery Project may adversely affect spotted owls in the area,

3   was already addressed in the EIS and factored into this

4   decision." AR A00038. In light of the administrative record,

5   Plaintiffs have not raised serious questions as to whether this

6   analysis is arbitrary or capricious.

7           Plaintiffs' allegations amount to a battle of the

8   experts because the writings by Lee, Clark, DellaDala and Bond

9   are not the complete universe of scientific inquiry into the

10  California spotted owl's relationship with wildfire discussed in

11  the FEIS. In discussing the California spotted owl, the Forest

12  Service relied on Keane (2014) and incorporated that research

13  into the FEIS by reference. AR B00431, B00445. Keane (2014) is an

14  academic survey that "synthesize[s] scientific information on the

15  California spotted owl that has been reported since [2001]." AR

16  K12132-133. It references and discusses work related to spotted

17  owls published by Bond, Clark, and Lee along with others in the

18  field. AR K12153-157.  In a section titled "Effects of Forest

19  Management and Wildfire," Keane (2014) reviews more than a decade

20  of published scientific research regarding the impact of wildfire

21  on the California spotted owl and concludes "[c]urrent

22  information indicates that California spotted owls will occupy

23  landscapes that experience low- to moderate-severity wildfire, as

24  well as areas with mixed-severity wildfire that includes some

25  proportion of high-severity fire," which is the same conclusion

26  advanced by the Forest Service in the FEIS.  AR K12141-143; AR

27  B00742.

28          Given the Forest Service's reliance on Keane (2014),

1  Plaintiffs' claim raises a quintessential "battle of the
2  experts," which falls short of demonstrating a NEPA violation.
3  Earth Island Institute v. Carlton, 626 F.3d 462, 473 (9th Cir.
4  2010) ("The district court here found just such a 'battle of the
5  experts' to exist, but concluded that this did not establish a
6  violation of NEPA. It was within its authority to do so."); J.L.
7  Mercer Island School Dist., 592 F.3d 938, 945 n.5 (9th Cir. 2009)
8  ("The parties' arguments throughout this litigation have
9  routinely bordered on the quintessential 'battle of the experts'
10  concerning what educational policy and teaching method is most
11  effective for learning-disabled students. The District is
12  entitled to deference in deciding what programming is appropriate
13  as a matter of educational policy."); Native Ecosystems Council
14  v. U.S. Forest Serv., 428 F.3d 1233, 1244 (9th Cir. 2005) ("Nor
15  will we 'take sides in a battle of the exerts,' as the Forest
16  Service considered and applied the [evidence at issue] and
17  provided a thorough and reasoned explanation for its rejection of
18  [a third party's] position.").

19  Regarding Clark (2007), whose conclusions Plaintiffs
20  claim the Forest Service misstated, Plaintiffs' argument is
21  similarly insufficient to demonstrate substantial questions as to
22  whether the Forest Service complied with its NEPA obligations.
23  The FEIS describes Clark (2007) this way: "Clark (2007) found
24  that while spotted owls did roost and forage within high severity
25  burn areas, the use was very low. The results suggest that this
26  cover type was poor habitat for spotted owls." AR B00446.
27  Plaintiffs argue this description of Clark (2007) is untenable
28  given Figure 6.2 in the study, which shows northern spotted owls

use highly burned habitat at a higher rate than it occurs in the environment. AR K04468. However, this figure does not address the rate at which the owls choose highly burned areas over other habitats. Therefore, it does not contradict the Forest Service's analysis—drawn from the entirety of the 218 page thesis—that the spotted owl's use of high severity burn areas was low. The figure does not demonstrate it would be arbitrary or capricious to read the entirety of Clark (2007) as suggesting that high severity burn areas are a poor habitat for spotted owls. Because Plaintiffs have not raised serious questions regarding the Forest Service's discussion of the relevant scientific literature, their motion for a preliminary injunction on this ground is denied.

>    **b.    Failure to Make Proper Determination as to Whether the Rim Fire Logging Project Would Push Spotted Owls Below a Critical Viability Threshold**

Plaintiffs argue the Defendants "have not articulated a meaningful explanation why the [Project] would have a negative impact on the California spotted owl, but would not result in a trend toward federal listing" and have "also not determined the crucial threshold necessary to support this conclusion." (Reply 12:2-5.) Plaintiffs contend the Forest Service's analysis is insufficient because of the "four indicators [the Forest Service] used to 'provide a relative measure of the direct and indirect effects' [of the Project] to spotted owls, . . . only one . . . mentions foraging habitat and it was dismissed out of hand." (Reply 13:6-11.) Plaintiffs support their argument by citing to Earth Island II, 442 F.3d at 1147 (9th Cir. 2006), arguing "the

relevant facts of Earth Island II . . . are the same as the facts in this case" and compel a finding that the Forest Service did not comply with its NEPA obligations.

The Forest Service must provide a "meaningful explanation" when it concludes a proposed action will have a negative impact on individual animals, but will not result in a trend toward federal listing for the species. Ecology Ctr. Inc. v. Austin, 430 F.3d 1057, 1067 (9th Cir. 2005). "A court's inquiry, when reviewing whether an agency complied with NEPA, is whether the agency adequately considered a project's potential impacts and whether the consideration given amounted to a 'hard look' at the environmental effects." Kempthorne, 457 F.3d at 975.

Plaintiffs' assertion that the relevant facts of Earth Island II are the same as the facts in this case is incorrect since the Forest Service's conclusions regarding the project's impact on spotted owl habitat in Earth Island II were the opposite of its conclusions here.   442 F.3d 1147, 1172-73. In Earth Island II, the Forest Service based its decision to permit logging on the "determination that because the[] areas were heavily burned they are not likely to be suitable owl habitat." Id. at 1172. From that premise, the Forest Service concluded the proposed logging "may reduce the quality of owl habitat, but . . . would not reduce the overall amount of owl habitat." Id. 1171. The agency reached this conclusion in spite of Bond's research showing the logging "will have significant negative effects on the California spotted owl by substantially reducing the amount of potential foraging habitat within the project sites" because owls used the heavily burned areas to forage. Id. at 1170. The

Ninth Circuit determined that under the circumstances, the Forest Service had not taken a "hard look" since it did not "respond explicitly and directly to conflicting views in order to satisfy NEPA's procedural requirements" or "explain in any detail how their determinations that habitat was 'unsuitable' were made, and do[es] not investigate or analyze how [the action] might negatively impact the owls." Id. at 1172-73.

Here, unlike Earth Island II, the Forest Service directly confronted the science demonstrating owl's use of heavily burned areas, acknowledging the Project's potential to reduce the overall amount of owl habitat. AR B00445 ("Spotted owls use a broader range of vegetation conditions for foraging than they do for nesting and roosting. . . and this includes post-fire habitats . . . ;) AR B00446 ("Recent research indicates that California spotted owls will occupy landscapes that experience low-to moderate-severity wildfire, as well as areas with mixed-severity wildfire that includes some proportion of high-severity fire.")  Therefore, although the Forest Service's analysis in Earth Island II violated NEPA's procedural requirements, its analysis here does not.

Neither the APA nor NEPA creates a requirement that the Forest Service must determine a critical viability threshold before concluding a project will have negative impacts on some individual animals, but will not result in a trend toward federal listing. As the Ninth Circuit held in Lands Council:

> To always require a particular type of proof that a project would maintain a species' population in a specific area would inhibit the Forest Service from conducting projects in the National Forests. We decline to

> constrain the Forest Service in this fashion. Were we to do so, we may well be complicit in frustrating one or more of the other objectives the Forest Service must also try to achieve as it manages the National Forest System lands.

537 F.3d at 997. The Forest Service adequately explained the rationale behind its conclusion that the Project may affect individuals but is not likely to results in a trend toward Federal listing or loss of viability for the California spotted owl. AR B00460-461. Table 3.15-3 shows a summary of the indicators considered and the metrics used in the Forest Service's analysis. AR B00459. This analysis is shows the agency adequately considered the project's potential impacts on the California spotted owl as NEPA requires. Therefore, Plaintiffs motion for a preliminary injunction based on the Forest Service's failure to determine the California spotted owl's critical viability threshold is denied.

## IV. CONCLUSION

For the reasons stated above, both of Plaintiffs' motions are DENIED.

Dated:  October 6, 2014

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge